𝔚𝔶𝔱𝔥𝔢𝔳𝔦𝔩𝔩𝔢.

## HARRIS V. CARY AND OTHERS.

### June 8, 1911.

1. CONTRACTS—*Duress* — *Withholding   Property* — *Choice   Between Evils.*—Where one party has possession or control of the property of another, and refuses to surrender it to the control or use of the owner, except upon compliance with an unlawful demand, a contract made with the owner under such circumstances to emancipate the property is to be regarded as made under compulsion and duress.   So also a contract procured by threats, inducing fear of destruction of one's property, may be avoided on the ground of duress, there being nothing in such case but the form of a contract, wholly lacking the voluntary assent of the party bound by it.   To constitute duress, it is sufficient if the will be constrained by the unlawful presentation of a choice between comparative evils; as, inconvenience and loss by the detention of property, loss of property altogether, or compliance with an unconscionable demand.

2. CONTRACTS—*Duress*—*Enlarged   Significance*—*Taking   Undue   Advantage of Necessities.*—In civil cases, the rule as to duress has a broader application at present than formerly.   When concessions are exacted through the necessity of a person, in order to save his property, illegally withheld by another, from destruction or irreparable injury, such a transaction may be avoided on the ground of compulsion, though not amounting to technical duress.

Appeal from a decree of the Chancery Court of the city of Richmond.   Decree for defendants.   Complainant appeals.

*Reversed.*

The opinion states the case.

*G. A. Hanson* and *P. W. Hardin,* for the appellant.

*Bev. T. Crump* and *Lucius F. Cary,* for the appellees.

HARRISON, J., delivered the opinion of the court.

A demurrer to the original bill filed in this cause was sustained by the Chancery Court of the city of Richmond, and thereupon the complainant, J. W. Harris, by leave of court, filed an amended and supplemental bill, making the original bill part thereof, to which amended bill a separate demurrer was filed by the defendant, W. M. Cary, which was also sustained. From the decree sustaining the demurrer to these bills, and dismissing the same, this appeal was allowed. The original bill being *in totidem verbis* made a part of the amended and supplemental bill, the two will be treated and considered as one bill.

The more important allegations are, that in January, 1904, J. Samuel McCue and Caroline H. Harris entered into a contract between themselves and the complainant, that the parties, other than the complainant, would furnish a sum of money sufficient to option, open up, purchase and sell lands and mineral rights in Buchanan county, Virginia, and that the complainant should share equally with them in the net proceeds, after the money advanced, with interest and expenses, had been paid, in consideration of his time and services in developing, opening and selling the lands and mineral rights so optioned or purchased. It is further alleged that on May 23, 1904, the parties, together with the defendant, W. M. Cary, entered into another contract enlarging the first, and agreeing to advance a larger amount of money for the purchase of additional lands, and further agreeing to organize a corporation to be known as the Buchanan Coal and Coke Company, to which the properties bought should be conveyed. It was further agreed that all moneys advanced and to be advanced should be represented by the preferred stock of the company in proportion to the amount advanced by each; that the common stock was to be likewise apportioned, except that the rights

of the complainant were provided for in these words:
"And J. W. Harris, in lieu of his services rendered in se-
curing said property and to be rendered until said pre-
ferred stock is redeemed, is to receive one-third of the com-
mon stock of said corporation, issued for said property."
It is further alleged that subsequently the defendant, W. M.
Cary, and W. E. Harris visited Buchanan county and in-
spected the lands then under option, and other lands adja-
cent and in that section, and while there the defendant,
W. M. Cary, though well satisfied with complainant's work,
and much elated over the value of the lands, insisted that
as they were buying more lands than originally contem-
plated, and as he was advancing and paying out so much
money to secure the lands, complainant should be willing to
surrender one-ninth of his interest in the common stock;
that for the sake of harmony he had agreed to this, and
on September 3, 1904, had united with the defendant, Cary,
and W. E. Harris in a written contract, under which he was
to receive, in consideration of his services, two-ninths of
the common stock of the company instead of one-third
thereof, as provided in the previous contracts. It is further
alleged that under this agreement of September 3, 1904,
complainant continued his work and services, as he had
under the former agreements, faithfully and assiduously
doing and performing his work under the direction of the
defendant Cary, president of the company, from whom he
received approximately one hundred and fifty letters, in-
structing and directing him in regard to taking more op-
tions, renewing others, dropping some, and buying and
paying for certain lands, having the surveys made and
opening the coal—in fact, everything in detail pertaining to
the lands and interests of the company; that under these
directions certain lands embraced in the options to McCue
were dropped and other lands, in their stead, bought for
the company, the complainant being directed not to stop

taking options and buying lands until from 22,000 to 30,000 acres were secured.

In the mean time Cary, the defendant, had become the purchaser of all of the interests in the company of J. Samuel McCue, under the contract of May 23, 1904, and had thereby become the owner of three-fourths of the holdings of the company, and was under obligation to advance three-fourths of the money necessary to pay for all the lands bought and the costs incident to their purchase; and holding the majority interest in the company, he was elected president, and his two sons directors, one of them being secretary and treasurer, thereby having complete control of the affairs of the company.

Complainant further alleges that from September 3, 1904, the date of his agreement to take two-ninths of the common stock for his share in the profits, instead of three-ninths, as formerly agreed, to July 19, 1907, there had been no dispute or question raised, or even intimated, as to the meaning of the agreement of September 3, 1904, fixing his interest at two-ninths of the common stock of the Buchanan Coal and Coke Company; that on July 19, 1907, the defendant, Cary, while acting as president of the company, and as such a trustee for complainant, for the purpose of forcing complainant to surrender and sacrifice his interests in the company to him, Cary, wrote a letter to complainant, saying that he had had the two contracts of May and September, 1904, submitted to competent men, and that their finding was, and his interpretation always had been, that complainant's interest in the common stock was limited to such lands as were optioned to J. Samuel McCue, when the defendant, Cary, knew at the time that complainant had worked for three years, without notice of such construction of the contracts, under his direction, and that at his instance a large part of the lands optioned to McCue had been rejected, and many thousands of acres of other lands

taken in their stead by the company; that other letters of like import were sent to complainant by the defendant, in one of which he was told that his interest in the common stock was based upon less than seven thousand acres of the land owned by the company.

It is further alleged that from the time the letter of July, 1907, was written, until March, 1908, the defendant, Cary, continuously demanded and insisted that complainant should surrender to him one-half of his two-ninths interest in the common stock, and by every conceivable device tried to persuade, induce and force him to do so, finally threatening complainant that if he did not surrender to him the stock demanded, he would let the whole thing go and the company be sold out, and that complainant would then get nothing.

It is further alleged that at the time of these importunities and threats, complainant had faithfully performed and fully completed his obligations under the contracts between the parties, and that the defendant, Cary, had wholly failed to perform his part of the contracts by advancing the money to pay for the lands that had been bought; that the defendant, Cary, then owed about $50,000 that he had agreed to advance, but instead of paying the same he permitted suits to be brought against the company on the obligations due for land, for the sole purpose of carrying out his threat to have the land sold, and thereby to destroy the entire interest of complainant in the common stock of the company, refusing at the same time to issue to complainant any part of the common stock until he should yield and comply with his demand that part of complainant's interest be given to him. Complainant further alleges that at the time this force and coercion was being exerted over him by the defendant, Cary, he had no business experience, except that had with the Buchanan Coal and Coke Company, and other work of like character; that all of his life,

since leaving school, had been spent in the mountains getting options upon coal and timber lands, prospecting and making openings in and otherwise developing such lands; that on March 6, 1908, he had no property except his interest in this company; that he was practically without money, having only about $25.00, and without any immediate prospect of getting employment; that he had a family to support, and owed nearly $1,000, which he had borrowed to sustain himself and family while working for the Buchanan Coal and Coke Company; that he was in financial and mental distress, brought about by the actions of the defendant, Cary; that in this distress, so brought about, he was unable to resist the threat of the defendant to let the debts go unpaid, and thereby force a sale of the property, which would result in the total loss of complainant's entire interest in the stock; that complainant was, and had been for some time, prior to March 6, 1908, in constant fear that all of his stock would be made worthless by the fraudulent course of the defendant, Cary; and that while in this state of fear and financial and mental distress, much against his will, he was forced to and did, for the purpose of having the debts paid and thereby saving himself from financial ruin, make and execute two agreements, dated respectively March 6, 1908, and March 18, 1908, which provided that he should only receive three-eighteenths instead of two-ninths of the common stock, which two-ninths under the contract in writing of September 3, 1904, represented his interest, not only for his time and labor for the three years he was at work subsequent to September 3, 1904, but also for one year of work rendered prior thereto under the contract known as the McCue contract.

Complainant charges that the defendant, Cary, took advantage of the fact that he was helpless and in his power, and of his own delinquency in failing to comply with his part of the contract by paying the outstanding debts, and

of his power as president of the company, chief owner of its assets, in control of its board of directors, and sole manager of its interests, to compel him to surrender, without consideration, one-fourth of his stock to the sole use and benefit of said Cary; that the stock he was thus required to give the defendant, Cary, was 166-2/3 shares, which at its par value amounted to $16,666-2/3. Complainant further charges that the agreements of March 6, 1908, and March 18, 1908, were obtained from him by force, fraud, intimidation and duress; that they are wholly without consideration, equity or right; and that if there was any basis or reason for his being required to give up any part of his stock, which he denies, the portion taken from him should go to the company, and the defendant, Cary, not be allowed to appropriate the same, as he has done, as his individual property.

The prayer of the bill is that the agreements of March 6, and March 18, 1908, by which complainant was forced to surrender to the defendant, Cary, one-fourth of his two-ninths interest in the common stock of the company, be set aside as null and void, so far as they affect the interest of complainant; that pending the further order of the court the defendant, Cary, be enjoined and restrained from selling or otherwise disposing of the stock acquired by said agreements or either of them, or if said Cary has parted with any part thereof, that he may be compelled to keep in his possession and under his control and ownership, subject to the future order of the court, an equal number of shares of like stock of the company to that obtained from complainant; that the said Cary or the Buchanan Coal and Coke Company be required to transfer or issue to complainant an equal number of shares of the company to that taken from him under the agreements aforesaid; and for general relief according to equity and good conscience, and as may be deemed proper by the court.

The doctrine appears to be well established that where

one party has possession or control of the property of another, and refuses to surrender it to the control and use of the owner, except upon compliance with an unlawful demand, a contract made by the owner under such circumstances to emancipate the property is to be regarded as made under compulsion and duress. Nor can it be doubted that a contract, procured by threats inducing fear of the destruction of one's property, may be avoided on the ground of duress, there being nothing in such a case but the form of a contract, wholly lacking the voluntary assent of the party to be bound by it. To constitute duress, it is sufficient if the will be constrained by the unlawful presentation of a choice between comparative evils; as, inconvenience and loss by the detention of property, loss of property altogether, or compliance with an unconscionable demand.

In civil cases, the rule as to duress has a broader application at the present day than it formerly had. So when concessions are exacted through the necessity of a person, in order to save his property, illegally withheld by another, from destruction or irreparable injury, such a transaction may be avoided on the ground of compulsion, though not amounting to technical duress. *Fitzgerald* v. *Construction Co.,* 44 Neb. 463, 62 N. W. 899; *Vine* v. *Glenn,* 41 Mich. 112, 1 N. W. 997; *Brueggestradt* v. *Ludwig,* 184 Ill. 24, 56 N. E. 419; *Alston* v. *Durant,* 2 Strob. (S. C.) 257, 45 Am. Dec. 596, and note; *Adams* v. *Schiffer,* 11 Colo. 15, 17 Pac. 21, 7 Am. St. Rep. 202; *Lonergan* v. *Buford,* 148 U. S. 581, 37 L. Ed. 569, 13 Sup. Ct. 684.

In the case last mentioned, citing *Radick* v. *Hutchins,* 95 U. S. 210, 24 L. Ed. 409, it is said that, "to constitute coercion or duress which will be regarded as sufficient to make the payment involuntary, there must be some actual or threatened exercise of power possessed, or believed to be possessed, by the party exacting or receiving the payment over the person or property of another, from which the latter has no other means of immediate relief than by making the payment."

In *Harmony* v. *Bingham*, 12 N. Y. 99-117, 62 Am. Dec. 142, cited by Mr. Justice Brewer in 148 U. S. 581, 37 L. Ed. 569, 13 Sup. Ct. 684, *supra*, it is said: "If a party has in his possession goods or other property belonging to another, and refuses to deliver such property to that other unless the latter pays him a sum of money which he has no right to receive, and the latter in order to obtain possession of his property, pays that sum, the money so paid is a payment by compulsion."

In the case at bar, the allegations of the bill, which are admitted to be true by the demurrer, state a case clearly calling for interposition of a court of equity to afford relief. The helpless situation and the extreme necessities of the complainant were taken advantage of to compel him to surrender to the defendant one-fourth of his property, which was under the latter's control, and to which, as alleged, he had no lawful right, in order to save such property from sacrifice; the choice offered the complainant being financial ruin or immediate compliance with the alleged fraudulent, oppressive and unconscionable demands of the defendant.

It is clear, both upon reason and authority that the bill states a good cause of action, entitling the complainant to relief, if the facts alleged are established by the evidence to be adduced.

The decree complained of sustaining the demurrer to the bill must, therefore, be set aside, and this court will enter such decree as the chancery court ought to have entered, overruling the demurrer. And the cause will be remanded to the chancery court, which will, in accordance with the prayer of the bill, enjoin and restrain the defendant, W. M. Cary, from disposing of the stock in controversy until the further order of that court; and for further proceedings to be had therein not in conflict with the views expressed in this opinion.

*Reversed.*